PORTER et al. v. INTERNATIONAL BRIDGE CO. et al.

(Supreme Court, Equity Term, Erie County.   August 15, 1912.)

1. EMINENT DOMAIN (§ 303*)—VALUE OF PROPERTY TAKEN FOR RAILROAD
   PURPOSES—ELEMENTS.

   An owner, suing in equity for the value of his land used by railroads
   for bridge and railroad purposes, is entitled to the best obtainable price
   as a seller's price, without reference to the purchaser's intentions as to
   use.

   [Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 815–
   817; Dec. Dig. § 303.*]

2. EMINENT DOMAIN (§ 300*)—COMPENSATION—EVIDENCE.

   The assessed value of land used by railroads for bridge and railroad
   purposes is some evidence of actual value, which the owner is entitled
   to recover, but is not controlling.

   [Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 811–
   814; Dec. Dig. § 300.*]

3. EMINENT DOMAIN (§ 303*)—VALUE OF USE OF LAND FOR RAILROAD PUR-
   POSES.

   An owner of land which has been used by railroads for railroad and
   bridge purposes is entitled to recover an amount constituting a fair and
   reasonable sum, treating the land used as having been actually rented
   by the railroads during the period of their use of the property, and may
   recover 5 per cent. per annum on the agreed value, plus the taxes, which
   the railroads must pay.

   [Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 815–
   817; Dec. Dig. § 303.*]

4. EMINENT DOMAIN (§ 303*)—COMPENSATION—DEPRECIATION IN VALUE.

   Where an owner of land used by railroads for bridge and railroad
   purposes was awarded full value of the land and the full value of the
   use thereof by the railroads, aside from a condition created by a change
   of grade of an abutting street, and not as depreciated by reason of the
   changed grade, the owner could not recover consequential damages oc-
   casioned by the change of grade.

   [Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 815–
   817; Dec. Dig. § 303.*]

Action by Peter A. Porter and others against the International
Bridge Company and others to determine the value of real estate in
possession of certain of the defendants for railroad purposes, and for
the value of the use of the property for such purposes.   Judgment
awarding damages.

See, also, 132 App. Div. 947, 117 N. Y. Supp. 1145.

Charles P. Norton, for plaintiffs.

Moot, Sprague, Brownell & Marcy, for defendant International
Bridge Co. and others.

POOLEY, J.   This case involves the title to Porter Square, in Buf-
falo, and the occupancy of a portion of it by the International Bridge
Company and allied railroads.   The law of the case has been finally
settled by the Court of Appeals, affirming the interlocutory judgment
below and leaving to this court the determination of the values of the
land and its use.   200 N. Y. 250, 93 N. E. 716, 21 Ann. Cas. 684.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

[1] The testimony varies, as is to be expected, between the conservative witnesses on behalf of the purchaser and those for the plaintiffs, who see greater values than actual sales would indicate. Both have substantial reasons for the opinions given. This excludes the fanciful prices, based not only upon the fact that the bridge and approaches exist, but that the land is essential to them, and that this fact should increase the price. I have heretofore filed a memorandum setting forth the rule of damages as excluding the consideration of the use of the property as a bridge or railroad terminal, and after a reconsideration of this proposition I am satisfied that the correct rule is as before stated; and, while the plaintiffs are entitled to the best available price, it is a seller's price, and has nothing to do with the buyer's intentions as to use. The court has found, as conceded by the parties, that the premises in question are a necessary approach to the bridge. As built and operated, this is apparent; but they are not absolutely so, because a slight shifting of the Buffalo end of the bridge, or a deviation in the alignment of the tracks and a rearrangement of the layout of the terminal, while necessarily expensive, could avoid the use of the property. Moreover, it is the purpose of the determination herein to treat this proposition as one accomplished before the technical violation of the property rights of the owners by the occupancy of the property before the actual acquiring of title to it. Otherwise, this would simply present a case of ejectment, where the unlawful occupant would be legally required to vacate the property, at whatever cost or inconvenience, and without the option of taking it and paying for it at a fair price. The plaintiffs herein have chosen, and wisely, to approach the proposition from the equity side, and thus reach a conclusion fair to all concerned. It bears a near resemblance to a permitted occupation with an understanding that title will subsequently be passed.

[2] We come, then, to a consideration of the value of the property aside from its value as a terminal; and because of the large amount involved and the extraordinary extent of the litigation, I shall at the risk of prolixity indicate the way in which my conclusions have been reached. The assessed value of the property is some guide as to the actual value, although not controlling. The entire square was assessed as follows:

| | |
|---|---:|
| From 1873 to 1875, inclusive | $ 2,625 |
| " 1876 to 1877, " | 13,400 |
| " 1878 to 1885, " | 10,720 |
| " 1886 to 1888, " | 13,400 |
| " 1889 to 1902, " | 16,375 |
| " 1903 to 1911, " | 26,375 |

The entire square contains 71,982 square feet. The portion actually involved contains 28,044 square feet, according to plaintiff's revised description by Mr. White, leaving out a small parcel on the southerly line, and which revised description should be followed in the findings and final judgment. This is a little less then 40 per cent. of the entire area, and thus, for the purposes of taxation, the assessors placed a value on the portion actually occupied at about $10,550 from 1903 to 1911.

Speaking from the practical viewpoint, the experienced real estate dealer, in view of the fact that the parcel occupied is irregular in shape, bases his figures upon the squaring out of the piece so that the remainder would be regular in shape; and he thus deals with a frontage of 214 feet on Niagara street and running through to Dearborn. The entire square measures 364 feet frontage on Niagara, running through to Dearborn. This would make the portion of 214 feet frontage about 60 per cent. of the whole, and the assessed value of it would be $15,825. If we assume that the assessed value is one-half the actual, we would on this basis arrive at a valuation of $31,650, using Mr. Gurney's method, or $21,100, if based on the exact area occupied.

If the bridge and railroad were not there, this land would be worth no more and no less than other surrounding properties similarly situated, whether for business or resident purposes, except that, aside from the bridge, it is contiguous to the New York Central tracks, and hence might be of added value commercially as a single large parcel so situated. The fact of the bridge and railroad connections being there does not seem, from the evidence, to have actually increased values in the immediate vicinity to any great extent. Increased values in parcels more remote are accounted for by the increased railroad facilities in the territory, and not confined to the bridge project. The testimony shows many actual purchases in the immediate vicinity of the bridge at from $30 to $100 per foot front during the past 10 years, and in several cases since the determination of the grade crossing commission to change the grade of Niagara street, with resultant damages to be awarded to parcels of land affected. These seem to me to afford substantial evidence of value, although not necessarily conclusive, because, for example, conditions may be such that a resident on a given parcel, foreseeing the business uses to which the surrounding properties are being put, might well determine that he would reside elsewhere, and possibly sacrifice something of his supposed or real values in making the change.

The plaintiff and his co-owners should receive every dollar that the property can fairly bring. It has come to them, one may say, as a gift. A specific devise would, however, have been no less so, and absolute title would result as well in one case as the other, and a clear right to realize the best returns from it. But the testimony which places valuations at $100,000 and upwards is evidently based upon the witness' idea of what the parcel is worth as a railroad and bridge terminal, because otherwise there is no substantial basis for such values.

A reading of the cross-examination of the expert witnesses is instructive. Leaving out of consideration the use of the property as a terminal for the bridge, they place values on Niagara frontage at from $70 to $150 per foot, and on Dearborn street at from $50 to $125 per foot. If the bridge company were negotiating for this property before actually occupying it, the owners would doubtless endeavor to obtain the best price attainable; but this would not be determined by the consideration of the use to which it would be put, because that would be no concern of the seller, willing to part with his land. It

might become, at once upon purchase, of very great value to the purchaser, due to its advantageous location in connection with other properties before or after acquired; but the question would be whether he would purchase it at the price, or make other arrangements, or abandon his project.

The irregularity of the shape of the parcel in question is of little consequence, and, as described in the judgment by metes and bounds, is all that need be considered. It figures, according to the testimony, 28,044 square feet. Squaring this into lots gives us 142 feet on each street, or a total of 284 feet of frontage by 99 feet in depth for the purpose of arriving at a value. Giving due weight to all considerations proper to be considered, and a fair margin in favor of the owners, I think $150 per foot on Niagara and $100 on Dearborn, or the sum of $35,500, is a proper award.

[3] Regarding the value of the use, I am of the opinion that 5 per cent. per annum would be fair and reasonable. This is to be reckoned from a date six years prior to the commencement of this action, or from April 15, 1886, a period of 26 years and 4 months. If this were vacant land, unoccupied, the value of the use might be nominal; but, in my view of it, it must be treated as of a parcel of a given value, which is sought for actual use, and actually rented for the period from 1886. Hence the use of a property, of only nominal value while vacant, acquires at once a value because of its occupation, and this value would in a large measure be based upon the land value. Active property should produce a net rental of 5 per cent. if compared with other investments in live properties. So, if a lease were to be made on this basis, the rental would be reckoned as of 5 per cent. on the agreed valuation plus the taxes, or at 5 per cent. on the valuation and the tenant paying the taxes.

If we were making this lease as of the year 1886, these details would have been agreed upon or varied from these figures to meet the minds of the contracting parties. We are called upon here to transfer ourselves back to the time from which this transaction is to be reckoned, and as nearly as possible to meet what would have been the then conditions. In this view, I am of the opinion that no set-off can be allowed for the taxes paid by the bridge company.

But, in arriving at the value of the use, another circumstance is apparent, requiring consideration. I am of the opinion, based on the evidence, that the value of the property was much less in 1886 than at the present time. Mr. Griffin estimates the value in 1886 as at about one-half the amount as of the present time. The assessors have made two increases since 1886, namely: From 1886 to 1888, the assessed value was $13,400; from 1889 to 1902, $16,375; and from 1903 to 1911, $26,375. Using these figures, not as the value, but as affording a ratio, roughly, of 13, 16, and 26, the value for rental purposes would be as follows: From April 15, 1886, to April 15, 1889, it would be $13/26$ or $\frac{1}{2}$ of the present award, or $17,750, and 5 per cent. per year for these three years, or 15 per cent., would amount to $2,663. From April 15, 1889, to April 15, 1902, or 14 years it would be $16/26$ of the present award, or $21,847, and 5 per cent. per year for

these 14 years would amount to $15,293. From April 15, 1902, to August 15, 1912, or 9 years 4 months, it would be the present award of $35,500, and 5 per cent. per year for these 9 years 4 months, or 47 per cent., would amount to $16,685, and for the entire period a total of $34,642. While, therefore, the owners have the advantage of receiving for the fee the full present value of the property, it is but fair that the value of the use should be governed by the fact that this value was less, and gradually increased in the past years.

[4] As to the award, if any, for consequential damages by reason of the change of grade of Niagara street, I am of the opinion that the plaintiff and his co-owners have no claim upon it, for the reason that they are here being awarded the full value of the land and full value for its use from 1886, with the view of compensating them the same as if the land had in 1886 been actually conveyed to the bridge company. If that had been done, there could be no question but that the bridge company would be entitled to the award. If damages are awarded, it must be upon the theory of depreciation. We have endeavored to place a value aside from the condition created by the change of grade, and have treated it as so much land with street at grade with it, and placed a price upon it as of its full value, and not as of a depreciated value by reason of the change of grade.

The final judgment will then award for the fee of the land in question the sum of $35,500, and for the use of the same from April 15, 1886, to this date, the sum of $34,642, or a total of $70,142. No set-off is allowed for taxes paid; and the award, if any, made in payment for damages to said premises by reason of the change of grade of streets shall be paid to the bridge company.

Findings may be submitted in accord with the above conclusions; and in view of the great number of parties to participate in the distribution of the award, both plaintiffs and defendants, and the fact that several are acting in representative capacities, possibly requiring court proceedings to enable them to give proper acquittances, and also to the end that the bridge company may have complete title and possession upon payment, the judgment will direct the payment of the award into court, with costs, by depositing the same with the treasurer of Erie county to the credit of this action, and, following the interlocutory judgment, as affirmed by the Court of Appeals, provide that upon failure to comply with the final judgment within 60 days the bridge company and others in possession, bound by this judgment, vacate the premises.